## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GAS CITY, LTD., *et al.,*[1] | ) | Case No. 10-47879 (ERW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

### NOTICE OF MOTION

**PLEASE TAKE NOTICE** that, on September 21, 2011, at 10:00 a.m. (Central time), or as soon thereafter as counsel may be heard, we shall appear before the Honorable Eugene R. Wedoff, or such other judge as may be sitting in his place and stead, in Room 744 of the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago, and then and there present the Motion of the Debtors, Pursuant to Sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code and Rules 1017, 2002(a)(4) and 9013 of the Federal Rules of Bankruptcy Procedure, for Entry of Orders: (A) Approving Procedures for (i) the Distribution of Remaining Funds Under Global Settlement Agreement, and (ii) the Dismissal of the Debtors' Chapter 11 Cases; (B) Dismissing the Debtors' Chapter 11 Cases; and (C) Granting Certain Related Relief (the "Motion"), a copy of which Motion is attached hereto and hereby served upon you.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion referenced above must be filed with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division and served upon the Debtors' undersigned counsel, so as to be actually received no later than 11:59 p.m. (Central time) on September 14, 2010.

---

[1] The Debtors in these chapter 11 cases are: Gas City, Ltd. and The William J. McEnery Revocable Trust Dated 4/22/1993.

Dated: August 9, 2011   **PROSKAUER ROSE LLP**
   Chicago, Illinois

/s/ Paul V. Possinger
Mark K. Thomas (ARDC# 6181453)
Paul V. Possinger (ARDC# 6216704)
Grayson T. Walter (ARDC# 6291008)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

*Counsel for Gas. City, Ltd., Debtor and
Debtor in Possession*

-- and --

**PERKINS COIE LLP**

/s/ Daniel A. Zazove
Daniel A. Zazove (ARDC# 3104117)
Kathleen A. Stetsko (ARDC# 6297704)
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400

*Counsel for The William J. McEnery Revocable Trust
Dated 4/22/1993, Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GAS CITY, LTD., *et al.,*[1] | ) | Case No. 10-47879 (ERW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**MOTION OF THE DEBTORS, PURSUANT TO SECTIONS 105(a), 305(a), 349
AND 1112(b) OF THE BANKRUPTCY CODE AND RULES 1017, 2002(a)(4) AND
9013 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR
ENTRY OF ORDERS:  (A) APPROVING PROCEDURES FOR (I) THE
DISTRIBUTION OF REMAINING FUNDS UNDER GLOBAL SETTLEMENT
AGREEMENT, AND (II) THE DISMISSAL OF THE DEBTORS' CHAPTER 11
CASES; (B) DISMISSING THE DEBTORS' CHAPTER 11 CASES;
AND (C) GRANTING CERTAIN RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion") requesting entry of orders, substantially in the forms

attached hereto as **Exhibits A**, **B-1** and **B-2**, pursuant to sections 105(a), 305(a), 349 and 1112(b)

of chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy

Code") and Rules 1017, 2002(a)(4) and 9013 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"):  (a) approving procedures for (i) the distribution of remaining funds under

the Global Settlement Agreement (defined below), and (ii) the dismissal of the Debtors' chapter

11 cases (the "Dismissal Procedures Order"); (b) dismissing each of the Debtors' chapter 11

cases (collectively, the "Dismissal Orders"); and (c) granting certain related relief.  In support of

this Motion, the Debtors respectfully represent as follows:

---

[1]  The Debtors in these chapter 11 cases are:  Gas City, Ltd. and The William J. McEnery Revocable Trust Dated
4/22/1993.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Joint Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and rule based predicates for the relief requested herein are sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017, 2002(a)(4) and 9013.

## INTRODUCTION

3.      When these Chapter 11 Cases were filed, virtually all of the Debtors' gas station assets were encumbered by perfected liens and mortgages in favor of 15 different secured creditors.  The Debtors' gas station assets were intertwined and intermingled, and the Debtors had no equity in them.  The Debtors, faced with 15 different secured lenders with different agendas and collateral, realized that the best way to maintain and preserve value was a competitive going concern sale process for their 50 gas station properties.  To implement that sale, the Debtors, each secured lender, the Illinois Department of Revenue, and Gas City's unsecured creditors' committee executed a Global Settlement Agreement that, among other things, called for the dismissal of these Chapter 11 Cases upon the conclusion of the sales and implementation of the settlement.  At this point, the sales have all been consummated and most of the Debtors' obligations under the Global Settlement Agreement, including distribution of the vast majority of sale proceeds, have been performed.  This Motion seeks to complete the implementation of the Global Settlement Agreement by completing the distribution of the Debtors' assets and dismissing these Chapter 11 Cases.

# BACKGROUND

## A.    The Chapter 11 Filings

4.    On October 26, 2010 (the "Petition Date"), each of Gas City, Ltd. ("Gas City") and The William J. McEnery Revocable Trust Dated April 22, 1993 (the "Trust" and, together with Gas City, the "Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases"). On November 4, 2010, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

5.    The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of A. Jeffrey Zappone, Chief Restructuring Officer for the Debtor, in Support of First Day Pleadings* (the "Zappone Declaration") [*Docket No. 28*] filed on the Petition Date and incorporated herein by reference.

## B.    The Debtors' Asset Sale

6.    On the Petition Date, the Debtors filed the *Motion of the Debtors for Orders: (A) (I) Approving Bidding Procedures in Connection with the Sale of Substantially All Assets of Debtor Gas City, Ltd. and All Related Real Estate Owned or Leased by Debtor William J. McEnery Revocable Trust Dated 4/22/1993, (II) Scheduling an Auction and Hearing to Consider the Sale of Assets, (III) Approving the Form and Manner of Notice Thereof, and (IV) Approving Procedures for the Payment or Surcharge of Accrued, Unpaid and Allowed Administrative Expenses and Certain Wind-Down Costs from Sale Proceeds; (B) (I) Authorizing and Approving the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (II) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [*Docket No. 25*], as amended pursuant to Docket No. 275 (the "Sale Motion"), seeking, *inter alia*, approval of the sale or sales of all or

3

substantially all of Gas City's assets and the related gas station real estate owned by the Trust (the "Assets").

7.    On January 13, 2011, the Court entered the *Order: (I) Approving Bidding Procedures in Connection with the Sale of Substantially all Assets of Debtor Gas City, Ltd. and All Related Real Estate Owned or Leased by Debtor William J. McEnery Revocable Trust Dated 4/22/1993, (II) Scheduling an Auction and Hearing to Consider the Sale of Assets, and (III) Approving the Form and Manner of Notice Thereof* (the "Bid Procedures Order") [*Docket No. 381*].

8.    On April 4, 2011, pursuant to the Bid Procedures Order, the Debtors conducted an auction (the "Auction") for the sale of the Assets, at which fourteen different bidders were selected as the winning bidders for the Debtors' various gas station locations.  On April 14, 2011, the Court entered an order approving the sales (the "Sale Order") [*Docket No. 705*].  The sales of the Assets to the winning bidders closed during the period commencing on May 2 and ending on May 17, 2011 (the latter date  is referred to herein as the "Final Closing Date").

C.    **The Global Settlement Agreement**

9.    In light of the intertwined nature of the Assets owned by Gas City and the Trust, and the competing claims of secured lenders to sale proceeds, the Debtors approached their secured lenders, the Committee and the Illinois Department of Revenue (the "IDOR") to negotiate a global settlement regarding allocation of Sale proceeds, credit bid rights, the distribution of sale proceeds to lienholders and parties in interest, and the case exit.

10.    The Debtors' negotiations ultimately resulted in a settlement agreement among the Debtors, all secured lenders, the Committee and the IDOR (the "Global Settlement Agreement").  On March 29, 2011, the Court entered an order approving the Global Settlement Agreement [Docket No. 638] (the "Settlement Order").  A copy of the fully executed, unredacted

Global Settlement Agreement was filed under seal with the Clerk of the Court on April 6, 2011 [Docket No. 654]. The Global Settlement Agreement became effective by its terms on April 14, 2011, the date of the entry of the Sale Order.

11.     The Global Settlement Agreement contains detailed provisions regarding the allocation of the proceeds of the Debtors' gas station properties and the working capital assets of Gas City among the Debtors' various creditor constituencies and regarding the conclusion of the Chapter 11 Cases. Specifically, Section 9 of the Global Settlement Agreement provides, in relevant part, that: "[t]he Parties each agree to consent to, support, and not object to the conclusion of and exit from the Bankruptcy Cases pursuant to a structured dismissal …; provided, however, that any such structured dismissal … must be consistent with the provisions of this Settlement Agreement…."

12.     Among other things, the Global Settlement Agreement provides that the proceeds of the sale or sales of the gas station properties (the "Station Proceeds") are to be allocated among: (a) the holders of valid mortgage liens on the subject properties (collectively, the "Station Lenders"); (b) Bank of America in its capacity as secured working capital lender to Gas City ("BofA"); (c) the Debtors' estates for payment of administrative and wind-down expenses; (d) an Unsecured Creditor Pool (as defined in the Global Settlement Agreement) for the benefit of allowed unsecured, non-priority, prepetition claims against Gas City (collectively, the "Gas City Unsecured Claims"); and (e) the IDOR for payment of its prepetition sales tax claim against Gas City. To the extent any gas station property, or portion thereof, is not encumbered by any mortgage lien, 50% of the proceeds attributable to such unencumbered property (the "Unencumbered Proceeds") is to be paid to the IDOR (this amount is the sole source of payment to the IDOR under the Global Settlement Agreement). Of the remaining 50% of Unencumbered Proceeds, up to $675,000 is to be paid to the Debtors' estates for further funding of

5

administrative and wind-down expenses, as needed, and the balance (including any unused portion of the $675,000 amount) is to be paid to the Station Lenders.

13.    The Global Settlement Agreement also provides that, in the event that the "Net Working Capital Proceeds" as of the final closing of the Sale of the gas stations is less than the "Net Petition Date Working Capital Value" (each as defined in the Global Settlement Agreement), then BofA shall have an administrative claim pursuant to section 507(b) of the Bankruptcy Code (the "Section 507(b) Claim").    The Section 507(b) Claim is to be paid first from the Unsecured Creditor Pool prior to any payment from such funds to holders of allowed non-priority claims against Gas City, with any remaining balance to be paid from the Unencumbered Proceeds prior to any payment to the IDOR, the Debtors' estates, or Station Lenders as described above.    The Global Settlement Agreement further provides that: "[n]otwithstanding anything to the contrary in this Agreement, BofA may only assert a Section 507(b) Claim if there is a decrease in the Working Capital from the Petition Date to the Closing." [GSA, §5(b)].

14.    The Global Settlement also provided for general releases among the parties, releases of administrative claims between the two Debtors, waivers of unsecured deficiency claims by BofA and the Station Lenders against Gas City, and waivers of certain avoidance actions.

## D.    Sale and Working Capital Results

15.    The aggregate amount of the proceeds of the Station Proceeds, net of break up fees payable to Court-approved stalking horse bidders, was $130,295,310.[2]    Pursuant to the

---

[2] This amount does not include the proceeds of any of Gas City's working capital assets, including inventory.

allocation formulae set forth in the Global Settlement Agreement, the Station Proceeds have been allocated as follows:

    a.    $1,461,316 to the Unsecured Creditor Pool;

    b.    $5,775,210 for administrative and wind-down costs;[3]

    c.    $5,801,842 to BofA on account of its secured claim against Gas City;

    d.    $6,628,861 to payment of real estate taxes;

    e.    $182,218 to payment of transfer taxes;

    f.    $1,567,515 of net Unencumbered Proceeds; and

    g.    $108,987,105 to the Station Lenders on account of their respective mortgage loans to the Trust, subject to (i) payment of any remaining real estate taxes <u>and</u> (ii) a proposed reimbursement to BofA in the amount of $586,838 for costs relating to the sale of the Station Lenders' real property collateral that was paid from BofA's cash collateral prior to the closing of the sales (the "<u>Proposed BofA Reimbursement</u>").

    16.    On or around June 24, 2011, the Debtors distributed $108,612,442 to the Station Lenders, representing 99% of the Station Lenders' share of the Station Proceeds, and the Debtors distributed $5,221,657 to BofA, representing 95% of BofA's share of the Station Proceeds. Another 3% of BofA's share of the Station Proceeds was distributed to BofA on or around June 30. The Debtors held back 1% of the Station Lenders' share of the Station Proceeds, in the present aggregate amount of $2,694,309[4] (the "<u>Station Lender Holdback</u>"), and $116,037 of BofA's share of the Station Proceeds (the "<u>BofA Holdback</u>"), to provide a source of funds for any subsequent adjustment of the distribution among the various recipients, as needed for,

---

[3] The remaining $224,790 of the $6,000,000 allocated under the Global Settlement Agreement for administrative and wind-down costs was contributed from the proceeds of Gas City's inventory.

[4] This number includes 100% of the share of the Station Lender on former Gas City station #151 (First Community Bank of Homer Glen and Lockport) in the amount of $1,612,474. This sum has been held back pending the resolution of the pending dispute regarding the allocation of the proceeds between encumbered and unencumbered portions of the real estate (the "<u>151 Dispute</u>"). See Docket Nos. 898, 999, 1027 and 1040.

among other things, payment of the Proposed BofA Reimbursement and certain real estate taxes that will not be finalized until October 2011.

17.     Following the closing of the Station sales, pursuant to the Global Settlement Agreement, the Debtors deposited $5,775,210 of the Station Proceeds, plus another $224,790 of proceeds from the sale of Gas City's inventory (for a total of $6,000,000), into an interest-bearing account with PNC Bank for the purpose of paying administrative and wind down expenses and claims that were either accrued and unpaid as of the Final Closing Date or have been accrued since the Final Closing Date.  These funds have since been used to pay employee wages and benefits, accrued professional fees (in accordance with Court orders), and general administrative costs associated with the wind-down of the estates.  Additionally, pursuant to the Global Settlement Agreement, up to $675,000 of the Unencumbered Proceeds is also available for payment of such administrative and wind down expenses and claims (this amount, along with the $6,000,000 of station and inventory proceeds described above, is collectively referred to herein as the "Administrative Claim Pool").

18.     Since the Final Closing Date, the taxing authorities of various counties located in the states of Indiana and Arizona have asserted personal property tax claims relating to property of Gas City that was sold to various gas station buyers, in the aggregate amount of $128,508 (collectively, the "Personal Property Taxes").  The Debtors are evaluating whether any of the asserted Personal Property Taxes constitute valid claims against the Debtors in accordance with the Bankruptcy Rules and prior orders of this Court.  To the extent such claims are valid claims against Gas City, they will be secured by liens on the subject property with priority over the liens of BofA, which liens have attached to the proceeds of the sale of the equipment.  See Ariz. Rev. Stat. Ann. § 42-17153; Ind. Code Ann. § 6-1.1-23-1(d) (West).  Gas City asserts that any Personal Property Taxes that constitute valid claims against Gas City must therefore be paid

8

from the BofA Holdback and BofA's share of the Station Lender Holdback prior to distribution to BofA.

19.    The Debtors have not yet made any distribution of the Unsecured Creditor Pool or the Unencumbered Proceeds, as the calculation of both distributions is dependent on the amount of the BofA Section 507(b) Claim.  Gas City has recently completed its analysis of the value of its Working Capital (as defined in the Global Settlement Agreement) as of the Petition Date and proceeds thereof as of the Final Closing Date.  A copy of this report (the "Working Capital Report") is attached hereto as **Exhibit C**.  As described in greater detail in the Working Capital Report, Gas City has concluded that the "New Working Capital Proceeds" (as defined in the Global Settlement Agreement) as of the Final Closing Date was $897,000 less than the "Net Petition Date Working Capital Value" (as defined in the Global Settlement Agreement); accordingly, the BofA Section 507(b) Claim is $897,000.

20.    Specifically, the Debtors determined that the value of Gas City's Working Capital as of the Petition Date was approximately $14,164,000, after reducing the $15,985,940 projected book value of working capital reflected on Schedule 5(b) of the Global Settlement Agreement by (a) $544,000 in Petition Date accounts receivable that were reflected on Gas City's books as of the Petition Date but that were uncollectible and had no value, and (b) $1,373,000 in "Petition Date Inventory Value", calculated pursuant to Section 2(jj) of the Global Settlement Agreement.[5] As of the Final Closing Date, the Debtors were left with Working Capital assets that either have generated, or the Debtors reasonably believe will generate, proceeds in the aggregate amount of

---

[5] Section 2(jj) of the Global Settlement Agreement defines "Petition Date Inventory Value" as "the value derived by multiplying the value of the Petition Date Inventory ($9,615,636) by a percentage determined by dividing (i) the sum of (a) the Inventory Proceeds and (b) the cash proceeds realized from any Inventory remaining in Gas City's estate after the Closing that is not sold as part of the 363 Sale by (ii) the book value of the Inventory at Closing (measured at Gas City's cost)."  The calculation of this value in accordance with the Global Settlement Agreement is set forth on Exhibit A to the Working Capital Report.

approximately $13,267,000.  The $13,267,000 figure consists of: (a) $5,946,000 in inventory proceeds; (b) $3,786,000 in collected accounts receivable; (c) $1,133,000 in accounts receivable yet to be collected; (d) $589,000 in vendor deposits yet to be collected; (e) approximately $700,000 in tax refunds and other miscellaneous items yet to be collected; (f) $954,000 in reimbursements to BofA for post-closing expenses that were paid from cash collateral, but that should have been paid from the Administrative Claim Pool; and (g) the Proposed BofA Reimbursement of approximately $587,000, representing repayment of BofA's cash collateral that the Debtors used to pay costs directly related to the marketing and sale of the Stations and related real estate assets during the Chapter 11 Cases, including phase 1 environmental reports, surveys, appraisals and costs relating to the Auction.  The $13,267,000 figure is also net of approximately $518,000 of sales taxes paid post-closing.  As such, the BofA Section 507(b) claim, based upon the diminution in value of Gas City's Working Capital from the Petition Date to the Final Closing Date, is $897,000**.**

21.    Pursuant to the Global Settlement Agreement, the payment of BofA's $897,000 Section 507(b) Claim shall be made from the Unsecured Creditor Pool, leaving a balance of $564,000 for distribution to holders of Gas City allowed Unsecured Claims.

**E.    Claims Status**

22.    On November 19, 2010, the Court entered the *Order Establishing Bar Dates for Filing Proofs of Prepetition Unsecured and Secured and § 503(b)(9) Administrative Expense Claims* (the "Bar Date Order") [*Docket No. 227*], pursuant to which January 3, 2011 (the "General Bar Date") was established as the deadline for all parties, other than governmental units, to assert unsecured or secured, priority or nonpriority, prepetition claims or administrative

expense claims arising under section 503(b)(9) of the Bankruptcy Code.[6]  As of the date of this Motion, the Debtors have substantially completed their claims review and objection process with respect to the Gas City Unsecured Claims and Section 503(b)(9) claims.

23.     On June 15, 2011, the Court entered the *Order Pursuant to Section 503(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing a Deadline for Filing Administrative Expense Claim Requests and Approving the Form and Manner of Notice Thereof* (the "Administrative Bar Date Order") [*Docket No. 918*], pursuant to which August 1, 2011 (the "Administrative Bar Date") was established as the deadline for all persons or entities, except the Excluded Entities (as such term is used in the Administrative Bar Date Order), to file an Administrative Expense Claim Request (as such term is used in the Administrative Bar Date Order).

24.     The majority of the administrative expense claims filed against the Debtors were prepetition claims arising or asserted under Section 503(b)(9) of the Bankruptcy Code, all of which have been either allowed, reclassified, adjusted or disallowed pursuant to the Debtors' claim reconciliation process.  Additionally, since the entry of the Administrative Bar Date Order, six administrative expense claims have been filed against Gas City.  The Debtors are reviewing these claims and will object to them as necessary or appropriate.  The Debtors believe they will have sufficient funds on hand in the Administrative Claim Pool to satisfy all remaining allowed, unpaid administrative claims and expenses.

F.     **Case Status**

25.     The Debtors have completed the sale of all of their assets relating to their former gas station operations.   Gas City's remaining assets consist of a small amount of unsold

---

[6]  The Bar Date Order established April 25, 2011 as the bar date for the filing of prepetition claims held by governmental units (the "Governmental Unit Bar Date").

inventory and certain uncollected intangible assets (e.g. accounts receivable and deposit refunds), all of which are subject to the liens of BofA and the proceeds of which are to be turned over to BofA when recovered pursuant to the Global Settlement Agreement. By this Motion, Gas City seeks to transfer title of all of its assets that have not been sold as of the dismissal of its Chapter 11 case to BofA, concurrently with the dismissal. The Trust's remaining assets consist of certain parcels of vacant real property and its ownership interests in various insolvent affiliated entities. The Trust has sought to abandon all of these assets pursuant to Section 554 of the Bankruptcy Code (see Docket No. 1020).

26. The Debtors have sufficient cash on hand in the Administrative Claim Pool to pay all allowed administrative expenses that remain unpaid. The Debtors also have funds in the Unsecured Creditor Pool for distribution to holders of Gas City Unsecured Claims. The Debtors do not, however, have sufficient funds on hand to solicit, confirm and effectuate a chapter 11 plan in compliance with section 1129 of the Bankruptcy Code. The Debtors therefore assert that the best interests of all of their creditors would be served by (a) the distribution of the remaining Station Proceeds and the distribution of the Unsecured Creditor Pool, each as outlined herein, (b) the payment of all remaining unpaid allowed administrative expenses from the Administrative Claim Pool, and (c) the dismissal of these Chapter 11 Cases. This result specifically was bargained for and agreed upon in paragraph 9 of the Global Settlement Agreement.

## RELIEF REQUESTED

### A.    Proposed Distribution of Remaining Sale Proceeds

27. The Debtors are presently holding the remaining Station Proceeds in the following "buckets": (a) the Station Lender Holdback in the aggregate amount of $2,694,309; (b) the BofA Holdback in the aggregate amount of $116,037; (c) the Unsecured Creditor Pool in the amount of $1,461,316; (d) the Unencumbered Proceeds in the amount of $1,567,515; and (e)

the Administrative Claim Pool in the remaining amount of $2,856,641 (including $675,000 of Unencumbered Proceeds). Additionally, Gas City is holding Working Capital proceeds that have not yet been distributed to BofA.

28. The Debtors seek this Court's authority to implement the Global Settlement Agreement by distributing the foregoing funds as follows:

    a. <u>Station Lender Holdback</u>: The Debtors propose to distribute the Proposed BofA Reimbursement from the Station Lender Holdback to BofA upon entry of the Dismissal Procedures Order. The Debtors will distribute the proceeds of Station 151 upon and in accordance with the resolution of the 151 Dispute. The Debtors will distribute the balance of the Station Lender Holdback upon the final determination of all real estate taxes accrued through the respective closing dates of each of the Station sales (subject to subsection (b) below with respect to BofA).

    b. <u>BofA Holdback</u>: The Debtors propose to use the BofA Holdback first for payment of Personal Property Taxes that constitute valid, allowed claims against the estate of Gas City. To the extent the BofA Holdback is insufficient to satisfy such claims, the balance of the Personal Property Taxes will be paid from BofA's share of the Station Lender Holdback.

    c. <u>Unsecured Creditor Pool</u>: The Debtors propose to distribute (i) $897,000 of the Unsecured Creditor Pool to BofA on account of its Section 507(b) Claim, and (ii) $564,000 on a pro rata basis to holders of allowed general unsecured claims against Gas City, each in accordance with the Global Settlement Agreement.

      d.    <u>Unencumbered Proceeds</u>:   The Debtors propose to distribute (i) $783,757.50 to the IDOR, (ii) $675,000 to the Administrative Claim Pool, and (iii) $108,757.50 on a pro rata basis to the Station Lenders, each in accordance with the Global Settlement Agreement.

      e.    <u>Administrative Claim Pool</u>:  The Debtors propose to use the funds in the Administrative Claim Pool to satisfy all allowed, timely filed administrative and wind down expenses and claims and all other administrative expenses that either have been incurred to date and not paid, or that are incurred between now and the dismissal of the Chapter 11 Cases.

      f.    <u>Gas City Working Capital</u>:   Proceeds of Gas City's remaining Working Capital will be collected by Gas City and remitted to BofA up until the entry of the Dismissal Order, at which time all remaining Working Capital assets (principally uncollected accounts receivable) will be turned over to BofA.

29.    Each of the foregoing proposed distributions is consistent with the Global Settlement Agreement previously approved by this Court and reflects both (a) the final results of the Debtors' sales of their gas station properties and businesses, and (b) the Debtors' determination of the amount of the Section 507(b) Claim, as set forth in further detail in the Working Capital Report.

30.    The Proposed BofA Reimbursement seeks to pay BofA, from the Station Lender Holdback, costs that were paid from BofA's cash collateral, prior to the Final Closing Date, directly incurred in connection with the marketing and sale of the Stations and related real estate – specifically, phase 1 environmental reports, surveys, Station appraisals, and costs related to the

Auction itself.  The Global Settlement Agreement provides that certain "Direct Costs" related solely to the Station sales were to be paid from Station Proceeds prior to allocation among the various creditor parties.  The Debtors assert that the costs comprising the Proposed BofA Reimbursement would not have been incurred absent the sale of the Stations (and the real property on which they sit), and thus, in the interest of fairness, should be paid from the Station Lender Holdback, even though certain of such costs are not expressly included within the definition of "Direct Costs" in the Global Settlement Agreement.  If the Debtors are not authorized to make the Proposed BofA Reimbursement, the BofA Section 507(b) Claim will increase by $586,838, which increase would reduce the Unsecured Creditor Pool by $568,000 (leaving the Gas City unsecured creditors with a gross recovery of approximately $4,000).  Charging these costs to the Station Lender Holdback is fair, equitable and within the spirit and intent of the Global Settlement Agreement, because the costs were directly incurred in connection with the sale of the Stations and related real estate, all of which directly benefited the secured creditors.

31.     Attached hereto as **Exhibit D** is an updated Station Proceeds distribution model setting forth the distributions of Station Proceeds that have already been made and the balance of the proposed distributions as described above, including the allocation of the Proposed BofA Reimbursement.

**B.**     **Proposed Unsecured Claim Distribution Procedures**

32.     The Debtors will make the distributions to the holders of Gas City Unsecured Claims from the Unsecured Creditor Pool pursuant to the terms of the Global Settlement Agreement.  Given the amount of funds available in the Unsecured Creditor Pool and the size of the unsecured claims pool, the Debtors respectfully request that the Court approve the following

guidelines governing distributions to holders of allowed unsecured claims against Gas City (the

"Distribution Guidelines"):

    i.        the Debtors shall be authorized to make a single pro rata distribution of the funds held in the Unsecured Creditor Pool to holders of Gas City Unsecured Claims;

    ii.       the Debtors shall not make any distribution on account of a Gas City Unsecured Claim where such distribution would be for the amount of $20 or less;

    iii.     any distributed check that has not been claimed and/or cashed within 45 days after distribution of the check (the "Check Cashing Period") shall be deemed void and the distribution on account of such claim shall be deemed forfeited by the creditor; and

    iv.     any funds remaining in the Unsecured Creditor Pool after the expiration of the Check Cashing Period shall be redistributed to holders of Gas City Unsecured Claims whose initial distribution checks have been cashed.

## C.    **Final Allowance of Professional Fees**

33.    After all distributions to holders of allowed administrative claims against both Debtors and distributions to Gas City Unsecured Claims are made, but before the Certification of Counsel and Request for Dismissal (defined below) is filed, the Debtors will schedule a final fee hearing and the case professionals will each file a final request for allowance and payment of all fees and expenses incurred during these cases.

## D.    **Certification of Counsel and Request for Dismissal**

34.    Finally, the Debtors seek approval of the following procedures (the "Dismissal Procedures") for the orderly dismissal of the Debtors' Chapter 11 Cases once the Debtors have made all of the distributions described above.

35.    After all distributions have been made in accordance with the Distribution Guidelines, final fee and expense applications have been adjudicated and all accrued and as yet unpaid fees owing to the Office of the United States Trustee ("UST Fees") have been paid, the Debtors request that the Court enter orders, substantially in form annexed hereto as **Exhibit B-1** with respect to Gas City (the "Gas City Dismissal Order") and substantially in the form annexed

hereto as **Exhibit B-2** with respect to the Trust (the "Trust Dismissal Order," and together with the Gas City Dismissal Order the "Dismissal Orders"), upon the filing of a certification of counsel and request for entry of the Dismissal Orders substantially in the form annexed hereto as **Exhibit E** (the "Certification of Counsel and Request for Dismissal").  The Certification of Counsel and Request for Dismissal will, among other things:  (a) verify that all remaining claim objections have been resolved; (b) confirm that all allowed administrative claims against both Debtors have been paid in full; (c) confirm that the Unsecured Creditor Pool has been distributed to holders of Gas City Unsecured Claims in accordance with the Distribution Guidelines; (d) confirm that all accrued UST Fees have been paid; and (e) request entry of the Dismissal Orders.

36.     The proposed Dismissal Procedures will allow the Debtors to make an orderly and expedient exit from bankruptcy once they have accomplished the primary goal of these Chapter 11 Cases, the liquidation of their assets and distribution of proceeds to creditors.  If approved, the Dismissal Procedures will also enhance judicial efficiency because the Debtors will not require additional time before the Court to dismiss their Chapter 11 Cases.

E.     **Preservation of Orders and Judgments**

37.     In order to preserve the finality of the Debtors' chapter 11 process, the Debtors also request that dismissal of the Chapter 11 Cases not affect the finality and/or *res judicata* effect of any settlements or stipulations reached or any order entered by this Court during the Chapter 11 Cases and prior to the dismissal thereof, including, without limitation, the Sale Order, the Global Settlement Agreement and the Settlement Order approving it.  Furthermore, the Debtors respectfully request that any motions, notices, objections, responses, adversary proceedings, contested matters or other pleadings or filings made during the course of the Chapter 11 Cases that have not been decided prior to the filing of a Certification of Counsel and Request for Dismissal, be denied, dismissed and/or overruled with prejudice.

17

38.     Section 349(b) of the Bankruptcy Code provides in relevant part:

Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title . . .

(2)  vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

(3)  revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

11 U.S.C. § 349(b).

39.     Numerous orders have been or may soon be entered in these Chapter 11 Cases, including orders approving the Debtors' use of cash collateral, the order approving the Global Settlement Agreement, orders approving settlements, and orders approving the sale of substantially all of the Debtors' assets.  Unless the Court orders otherwise, the default provisions of section 349(b) of the Bankruptcy Code could unravel the Sale, other dispositions, and other orders that have resulted from the Debtors' efforts to liquidate their estates and wind down their operations.

40.     In order to avoid that disastrous result, the Court should rule that sufficient cause exists for the Court to use its authority pursuant to section 349(b) of the Bankruptcy Code to order that: (a) all orders entered during these Chapter 11 Cases shall remain binding and in full force and effect for purposes of *res judicata* and otherwise; (b) all settlements approved by the Court and stipulations filed with the Court shall remain binding and in full force and effect; (c) all judgments, findings of fact and conclusions of law made by the Court in these Chapter 11 Cases shall remain in full force and effect; (d) no assets of the Debtors' estates shall revest in the Debtors upon dismissal; and (e) the effect of section 349 of the Bankruptcy Code shall otherwise be modified to implement the dismissal of the Chapter 11 Cases on the terms and conditions set forth herein.  By modifying the default provisions of section 349 of the Bankruptcy Code, the

Court will preserve the finality of the Debtors' efforts in these Chapter 11 Cases to liquidate their assets for the benefit of creditors.

## BASIS FOR REQUESTED RELIEF

### A.    Dismissal Is in the Best Interests of the Estates and Their Creditors

41.    From the inception of these Chapter 11 Cases, the Debtors, the Committee, BofA and the station lenders negotiated over the rights and obligations of the Debtors and their estates vis-à-vis the posture of these Chapter 11 Cases and the liens and claims of BofA and the Station Lenders.  Following the lengthy and often contentious negotiations that took place during these Chapter 11 Cases, the Debtors and their creditors ultimately agreed upon a resolution of the outstanding issues among them as embodied in the Global Settlement Agreement.  As the Debtors do not possess the requisite funds needed to confirm a chapter 11 plan, the dismissal of these Chapter 11 Cases as contemplated herein is the only way to avoid an unnecessary conversion of these Chapter 11 Cases to chapter 7.

42.    The conversion of these Chapter 11 Cases would not be in the best interests of these estates and their creditors.  Conversion would result in the immediate dissolution of the Committee and appointment of one or two chapter 7 trustees, who would have no unencumbered assets to liquidate.  The Unencumbered Proceeds are the only remaining unencumbered asset of either of the Debtors' estates, and the distribution of these funds is already governed by the Global Settlement Agreement.  The distribution of the Administrative Claim Pool and the Unsecured Creditor Pool, both of which are "carve-outs" from secured lender collateral proceeds, is also governed by the Global Settlement Agreement.  Gas City has sold all of its assets or will turn over any unsold assets to BofA concurrently with dismissal of the Gas City Chapter 11 case, and the Trust has either sold or sought to abandon all of its assets.  All avoidance actions, other than against Debtor insiders, have been waived and released.  Moreover,

the Debtors' principal insider, William McEnery, is the subject of an involuntary bankruptcy petition, which is scheduled for hearing on August 9, 2011.  Given the pending involuntary petition and the staggering amount of secured and unsecured debt against Mr. McEnery, the Debtors believe that any cause of action against Mr. McEnery's bankruptcy estate would not yield any value to the Debtors' estates.

43.     In contrast, an orderly dismissal of these Chapter 11 Cases will serve the best interests of these estates and creditors.  The Global Settlement Agreement was the product of diligent and constructive efforts of the Debtors, the Committee, the Station Lenders, BofA and the IDOR – i.e., virtually every creditor constituency in the Chapter 11 Cases.  The Global Settlement Agreement established the allocation of the assets of these estates, which allocation is binding on successor trustees.  The vast majority of the proceeds of the Debtors' assets have already been distributed pursuant to Court order (see Docket No. 913).  The only tasks left in these Chapter 11 Cases are to distribute the remaining proceeds in accordance with the Global Settlement Agreement and file final professional fee applications.  The estates are administratively solvent and will pay all allowed administrative claims and accrued expenses. Dismissal is therefore appropriate and the most cost-effective manner in which to conclude these cases.

**B.      Dismissal Is Warranted Under Section 1112(b) of the Bankruptcy Code**

44.     The Court should approve the Dismissal Procedures because the Debtors have no remaining unencumbered estate assets to liquidate and administer.  For the reasons stated herein, the Debtors submit that authorization to make the proposed distributions outside of a plan of reorganization and in the context of an orderly dismissal of these Chapter 11 Cases is justified and warranted under the circumstances of these Chapter 11 Cases.

45.    Under section 1112(b) of the Bankruptcy Code, a court shall "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, *whichever is in the best interests of creditors and the estates*, if the movant establishes cause."  11 U.S.C. § 1112(b) (emphasis added);  *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984);  *In re Blunt*, 236 B.R. 861, 864 (Bankr. M.D. Fla. 1999).  A determination of cause is made by the court on a case-by-case basis.  *Albany Partners*, 749 F.2d at 674.  The decision to dismiss or convert a case is particularly delegated to the bankruptcy court's sound discretion.  *See In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994) ("A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case for cause.") *citing In re Lumber Exchange Bldg. Ltd. P'ship*, 968 F.2d 647, 648 (8th Cir. 1992); *In re Jartran, Inc.*, 87 B.R. 525, 528 (N.D. Ill. 1988) ("section 1112(b) is discretionary in nature") *aff'd*, 886 F.2d 859 (7th Cir. 1989); *In re Camden Ordinance Mfg. Co. of Arkansas, Inc.*, 1999 WL 587790, at *2 (Bankr. E.D. Pa. 1999) *citing In re Atlas Supply Corp.*, 837 F.2d 1061, 1063 (5th Cir. 1988).  The Court is therefore authorized to dismiss the Debtors' Chapter 11 Cases upon a showing of "cause."

46.    The legislative history of section 1112(b) of the Bankruptcy Code and relevant case authority indicate that a court has wide discretion to use its equitable powers to dispose of a debtor's case.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 57878; *see also In re Preferred Door Co.*, 990 F.2d 547, 549 (10th Cir. 1993) (stating that a court has broad discretion to dismiss a bankruptcy case); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) (stating that a determination of whether cause exists under section 1112(b) of the Bankruptcy Code "rests in the sound discretion" of the bankruptcy court); *In re Koerner*, 800 F.2d 1358, 1367 & n.7 (5th Cir. 1986) (stating that a bankruptcy court is afforded "wide discretion" under section 1112(b) of the Bankruptcy Code); *Albany Partners*, 749 F.2d at 674 (same).  "[W]hen a bankruptcy judge is

asked to dismiss or convert a case under section 1112(b), he or she should consider which option best protects the interests of all the creditors." *In re Brauer*, 80 B.R. 903, 911 (N.D. Ill. 1987) (internal citation omitted). The Court is "not required to articulate expressly why dismissal [is] preferable to conversion." *Id*. at 912.

47.    Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of sixteen grounds for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(P); *Frieouf v. U.S.*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b) of the Bankruptcy Code's list is nonexhaustive); *In re Blunt*, 236 B.R. at 864 (same). One such ground is where a party-in-interest shows that there is an inability to effectuate a chapter 11 plan. 11 U.S.C. § 1112(b)(4)(M); *Preferred Door Co.*, 990 F.2d at 549; *Sullivan Cent. Plaza I*, 935 F.2d at 728. Inability to effectuate a plan arises when a debtor lacks the capacity to "formulate a plan or carry one out" or where the "core" for a workable plan of reorganization "does not exist." *See Preferred Door*, 990 F.2d at 549 (quoting *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989)) (finding an inability to effectuate a plan arises where debtor lacks capacity to formulate a plan or carry one out); *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 743-49 (Bankr. N.D. Ill. 2004) (noting that issues to be evaluated when determining a debtor's "inability to effectuate a plan" include the existence of a viable business enterprise as well as the more technical chapter 11 plan-confirmation standards); *In re Blunt*, 236 B.R. at 865 (finding cause to dismiss debtor's case under section 1112(b)(2) of the Bankruptcy Code where "core" for a workable plan of reorganization found to be nonexistent). Accordingly, the Court may dismiss the Debtors' Chapter 11 Cases because the Debtors are unable to effectuate a reorganization plan.

48.    Here, it is simply not possible for the Debtors to confirm a chapter 11 reorganization plan and there is no reason to attempt to confirm a chapter 11 liquidation plan.

The Debtors are no longer operating any of their businesses or stations.  As such, there is no business to reorganize and there are insufficient funds available to confirm a plan of liquidation.

49.    In addition to dismissal for inability to effectuate a plan, section 1112(b) provides that "cause" exists to dismiss a chapter 11 case where there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.   11 U.S.C. § 1112(b)(4)(A).  Here, there is no business remaining to rehabilitate.  Additionally, by continuing in bankruptcy, the Debtors would incur additional administrative expenses beyond their ability to pay.  Specifically, if the Debtors were to remain in bankruptcy, they would continue to incur quarterly fees payable to the United States Trustee as well as additional legal and other costs associated with administering the estates in chapter 11, causing a further diminution of their estates.  Case law supports dismissing a chapter 11 case where a prolonged bankruptcy process would serve no purpose and would reduce the funds available for creditors.  *See IFPC Shareholders*, 317 B.R. at 742-43 (United States Trustee fees and administrative expenses comprised mainly of legal expenses constituted "continuing loss," finding cause to dismiss debtor's chapter 11 case).  "In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow – including that resulting only from administrative expenses – effectively comes straight from the pockets of creditors."  *Loop Corp. v. U.S. Trustee*, 379 F. 3d 511, 516 (8th Cir. 2004) (internal citations omitted).  "This is enough to satisfy the first element of § 1112(b)(1)."  *Id*.  Here the second element, absence of a reasonable likelihood of rehabilitation, is also met, because, as stated above, following consummation of the Sale, the Debtors have ceased operations and liquidated substantially all of their assets.  *See id*. ("a liquidating debtor who had no intention of restoring its business had no reasonable likelihood of rehabilitation.").  In sum, the Debtors have met their

23

burden of proof to show that cause exists to dismiss these Chapter 11 Cases under section 1112(b) of the Bankruptcy Code.

50.     Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the estate and creditors.  *See In re Superior Sliding & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994);  *In re Mazzocone*, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), aff'd 200 B.R. 568 (E.D. Pa. 1996); *In re Warner*, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988).  A variety of factors demonstrates that it is in the best interests of the Debtors' estates and creditors to dismiss these Chapter 11 Cases and to authorize the Distribution and Dismissal Procedures sought herein.

51.     A dismissal of the Debtors' Chapter 11 Cases meets the best interests of creditors test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated. *See IFPC Shareholders*, 317 B.R. at 753-54 (dismissing case where conversion to chapter 7 "would not serve any substantial purpose"); *In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); *In re Camden Ordinance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage a business which ceased doing business was not feasible); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).  As noted above, the Debtors have nothing left to reorganize, as virtually all assets have been liquidated and there are no unencumbered assets which can be monetized in a cost-effective manner.  The only significant remaining task is for the parties to effectuate the Global Settlement Agreement and distribute the balance of the Sale proceeds in accordance with the terms of the Global Settlement Agreement.

52.     Additionally, dismissal of these Chapter 11 Cases is warranted because the alternative – conversion to chapter 7 – would not serve the best interests of the Debtors' estates

and creditors for the reasons discussed above.  One element of the best interests tests focuses

upon whether the economic value of the estate is greater inside or outside of bankruptcy.  *In re*

*Clark*, 1995 WL 495951, at 5 (N.D. Ill. 1995); *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr.

E.D. Cal. 1993).   The prime criterion for assessing the best interests of the estate is the

maximization of value as an economic enterprise.  *See id*.  Here, the terms of the Global

Settlement Agreement and the proposed Dismissal Procedures will maximize the value of the

Debtors' estates because conversion to chapter 7 would impose substantial and unnecessary

additional administrative costs upon the Debtors' estates with little likelihood that the estates and

creditors would recover more value than provided under the Global Settlement Agreement.

53.    Numerous courts, both in this district and throughout the country, have approved

orderly dismissals under similar circumstances to the Debtors' cases, where the debtor lacks the

requisite financial ability to confirm a chapter 11 plan and/or where the costs associated with

plan confirmation would eliminate the possibility of a meaningful creditor recovery.  *See, e.g.*, *In*

*re Select Snacks, Inc., et. al*, Case No. 07-18769, Docket No. 967 (Bankr. N.D. Ill. 2008)**;**  *In re*

*KB Toys, Inc.*, Case No. 08-13269, Docket No. 914 (Bankr. D. Del. 2009);   *In re CFM U.S.*

*Corporation, et. al.*, Case No. 08-10668, Docket No. 1097 (Bankr. D. Del. 2009);   *In re Wickes*

*Holdings, LLC, et. al.*, Case No. 08-10212, Docket No. 1418 (Bankr. D. Del. 2009);   *In re Bag*

*Liquidation, Ltd*, Case No. 08-32096, Docket No. 688 (Bankr. N.D. Tex. 2009);   *In re Levitz*

*Home Furnishings, Inc.*, Case. No. 05-45189, Docket No. 1167 (Bankr. S.D.N.Y. 2008);   *In re*

*Princeton Ski Shop, Inc., et al*, Case No. 07-26206, Docket No. 546 (Bankr. D.N.J. 2008);   *In re*

*Harvey Elecs., Inc.*, Case No. 07-14051, Docket No. 177 (Bankr. S.D.N.Y. 2008); *In re*

*Dawahare's of Lexington, LLC*, Case No. 08-51381, Docket No. 316 (Bankr. E.D. Ky 2008); *In*

*re Scient, Inc., et al.* Case No. 02-13455, Docket No. 821 (Bankr. S.D.N.Y. 2006);   *In re CSI,*

*Inc., et al.*, Case No. 01-12923, Docket No. 284 (Bankr. S.D.N.Y. 2006);   *In re New*

*Weathervane Retail Corp.*, 04-116349, Docket No. 566 (Bankr. D. Del. 2005*); In re Blades*

*Board & Skate, LLC*, Case No. 03-48818, Docket No. 126 (Bankr. D.N.J. 2004).

**C.**      **Dismissal Is Warranted Under Section 305(a)(1) of the Bankruptcy Code**

54.      Alternatively, cause exists to dismiss these Chapter 11 Cases pursuant to section

305(a) of the Bankruptcy Code, which provides, in pertinent part:

> (a)      The court, after notice and a hearing, may dismiss a case under this title,
> or may suspend all proceedings in a case under this title, at any time if—
>
> > (1)      the interests of creditors and the debtor would be better
> > served by such dismissal or suspension;

11 U.S.C. § 305(a).

55.      In applying section 305(a), courts have considered a wide range of factors,

including, but not limited to:

> (i)      economy and efficiency of administration;
>
> (ii)      whether federal proceedings are necessary to reach a just and equitable
> solution;
>
> (iii)      whether there is an alternative means of achieving an equitable
> distribution of assets; and
>
> (iv)      whether the debtor and the creditors are able to work out a less expensive
> out-of-court arrangement which better serves the interests in the case.

*See In re Crown Village Farm, LLC*, Case No. 09-11522 (KG), U.S. Bankr. LEXIS at *24

(Bankr. D. Del. June 12, 2009) (enumerating Section 305(a) factors and denying motion only

because dismissal or abstention would have a deleterious effect on the administration of the

debtor's chapter 11 case "which would languish while core issues were tried elsewhere"); *see*

*also In re Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996).  However, "the exact factors to be

considered and the weight to be given to each of them is highly sensitive to the facts of each

individual case." *Mazzocone*, 200 B.R. at 575.

26

56.     Dismissal of these cases is warranted under section 305(a)(1) for the same reasons that "cause" exists to dismiss these cases pursuant to section 1112(b) – approval of the Global Settlement Agreement and dismissal of the Chapter 11 Cases will effectuate an efficient administration of these estates and represents the least expensive and most equitable alternative for the distribution of the Debtors' assets.  Indeed, courts have approved structured dismissals similar to that proposed herein under section 305(a) of the Bankruptcy Code.  *See, e.g.*, *In re Scient, Inc., et al.*, Case No. 02-13455 (AJG), Docket No. 821 (Bankr. S.D.N.Y. 2006); *In re CSI, Inc., et al.*, Case No. 01-12923 (REG), Docket No. 284 (Bankr. S.D.N.Y. 2006).

**D.     The Debtors Have the Right to Dismiss the Chapter 11 Cases**

57.     Finally, case law supports the Debtors' freedom to dismiss their own cases, provided that their creditors are not harmed thereby.  *See In re Geller*, 74 B.R. 685, 690 (Bankr. E.D. Penn. 1987) (noting that the court would "grant such a motion [to voluntarily dismiss] in all but extraordinary situations"); *In re Kimball*, 19 B.R. 301, 302 (Bankr. D. Maine 1982) (refusing to allow a voluntary dismissal only because of the "substantial legal prejudice" that creditors would suffer if the debtor was allowed to file a new petition which would lead to a more encompassing discharge).  The Debtors' creditors will not be harmed by, and in fact will benefit from, dismissal of the Chapter 11 Cases because there is no scenario under which they will be entitled to a greater distribution than that proposed herein.

58.     The terms of the Global Settlement Agreement represent the parties' negotiated resolution of these Chapter 11 Cases.  Authorizing the distributions contemplated herein and allowing the dismissal of these Chapter 11 Cases furthers the efficient administration of the Debtors' estates and maximizes value for creditors.  Dismissing the Chapter 11 Cases will also provide finality for the Debtors, their creditors, former interest holders, and the Court.

59.    For the reasons set forth above, it is in the best interests of the Debtors, their estates, creditors and parties in interest to dismiss these Chapter 11 Cases in accordance with the Dismissal Procedures.

## **NOTICE**

60.    Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) counsel to BofA; (d) all known parties with liens of record on assets of the Debtors as of the Petition Date; (e) all financial institutions at which the Debtors maintain deposit accounts; (f) the Internal Revenue Service; (g) the Illinois Department of Revenue; (h) all other parties requesting notice pursuant to Bankruptcy Rule 2002; and (i) all other known creditors of the Debtors.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

*[remainder of page intentionally left blank]*

28

**WHEREFORE**, the Debtors respectfully request that the Court:  (a) enter an order, substantially in the form annexed hereto as **Exhibit A**, approving the Dismissal Procedures; (b) upon the filing of a Certification of Counsel and Request for Dismissal, enter Dismissal Orders, substantially in the forms annexed hereto as **Exhibit B-1** and **Exhibit B-2**, dismissing the Debtors' Chapter 11 Cases; and (c) grant such other and further relief as the Court deems just and proper.

Dated: August 9, 2011
      Chicago, Illinois

**PROSKAUER ROSE LLP**

/s/ Paul V. Possinger
Mark K. Thomas (ARDC# 6181453)
Paul V. Possinger (ARDC# 6216704)
Grayson T. Walter (ARDC# 6291008)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

*Counsel for Gas. City, Ltd., Debtor and
Debtor in Possession*

-- and --

**PERKINS COIE LLP**

/s/ Daniel A. Zazove
Daniel A. Zazove (ARDC# 3104117)
Kathleen A. Stetsko (ARDC# 6297704)
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400

*Counsel for The William J. McEnery Revocable Trust
Dated 4/22/1993, Debtor and Debtor in Possession*

29